And we'll move to our last case this morning, Darrell Burton v. Will County Sheriff's Merit Commission. Mr. Goldman, come on up. Good morning. Good afternoon, Your Honors. May it please the Court, I'm Jonathan Goldman and I represent Darrell Burton. And this is an appeal of a case that was dismissed on a summary judgment. Mr. Burton applied for a position as a Sheriff's Deputy with the Will County Sheriff. That is done by applying with the Will County Sheriff's Merit Commission, which conducts a variety of tests, interviews candidates, and develops a list of candidates from which the Sheriff's Office chooses deputies to hire. In Mr. Burton's situation, after he submitted a short-form application, a long-form application, passed a physical agility test, passed a personality test, and a polygraph exam, and then submitted information that was necessary for the commission to do a background investigation, he was simply waiting to be interviewed and was told that the application had been rejected. No justification for the rejection was given until after the District Court case was filed. This happened back in 2012 because of the EEOC investigation. The complaint was not filed until 2019, I think it was. I'm going to discuss two primary issues, the first being that this court should find that there is jurisdiction over the Merit Commission pursuant to the principles articulated in the Lies v. City of Riviera Beach case, and two, that there is sufficient evidence of discrimination to warrant a trial. First, this court should determine that there is jurisdiction over the Merit Commission. Mr. Goldman, could I ask you to address the points in reverse, please? In other words, what is your best evidence that the Merit Commission's decision was motivated by racial animus? Yes, Your Honor. Okay, well, we've put forth a number of theories in our brief in the court below, but the bottom line is that there are a number of facts that call into question the motivation of the commission in rejecting the appellant's application. As I had mentioned, the appellant passed the written exam and the psychological exam and the polygraph exam, but before he could be called for an interview, his application was rejected. Well, initially, it should be clear that the appellant is African American and that this was known to the commission. There's some dispute about that, but since he disclosed his race in multiple ways throughout the application process, including the fingerprint card which contained his race, there was a photograph taken of him so that they could identify him. The reason, it seems, that the commission gave for not including Mr. Burton on the final list was the comments that they received from CN, Mr. Burton's then-employer, and the commission just didn't like what the CN supervisors said, and so I guess the question becomes, and your claim is that that's pretextual, but that's not the real reason why he did not make the list, and so I guess my question is, what's your best evidence of pretext? Well, the issue with the investigation itself is really where there's a number of issues that call into question the commission's ultimate decision here. There was that statement from the supervisor, but the investigator shouldn't even have been talking to the supervisor in the first place. This is a human resources issue. Is this person, is this someone who would be promoted, and is this somebody who you would suggest for a position at the sheriff? Are you saying somebody else at CN should have talked to the investigator? Well, the original background investigation questionnaire went to the human resources department. So what? Once the commission has a bad reference from the guy who knows his work best, what's wrong with that? Well, the other thing was that the information that came out through the investigation should have prompted the commission, should have prompted the investigator to look a little bit more clearly. How hard do they have to look? Well, part of the supervisor's justification for his answer was that Mr. Burton had claimed that he had an on-the-job injury and that, let's see, I don't want to get the exact wording right. It was questionable. Yes, thank you. It was a questionable on-the-job injury, which calls into question, are they going to take some retaliatory action against Mr. Burton for his claim of an on-the-job injury, which is a violation of state law, it's a violation of Illinois public policy. And that should have prompted the investigator, that should have prompted the commission to take a step back. And as a matter of best practices, I mean, I can understand second-guessing this a little bit, but I mean, if you're in the position of evaluating a number of applicants, how much time do you have to invest in any particular one? Well, this is a very big issue for Mr. Burton. I understand that. He wanted to be the sheriff's deputy. He expected to be given full consideration for the position. I point that out in order to bring attention to the fact that this was, you know, there were a lot of non-standard things that had taken place, along with the investigator not really doing a full, complete investigation. You have the commissioner himself, one of the commissioners who was on the commission at the time that Mr. Burton made the application, who had made some racist remarks about another member of the commission by calling him a racist name, essentially. And each one of these things in and of themselves may not be- The term was what, that he was the colored member of the commission? Yes. Okay. Did you seek, did you offer any evidence of comparators? There's other applicants who had similar negative employer references who were treated more favorably than Mr. Burton. Well, through the statistical analysis that we provided at the district court level, we did show that the minorities, the non-white applicants for the position that we were able to identify as being non-white, had been, had not gotten the, they had, there was a statistical- They had a lower rate of certification, as I recall. Thank you.  Did you seek, did you find and submit to the district court comparators of applicants who had similar negative employer references who were treated more favorably? Not at the district court level, no. That was not presented to the district court. I mean, that would seem to me the strongest possible evidence of pretext or racial animus here. Well, I, you know, I can't say exactly what went on during the discovery stage at the district court level. I was not directly involved with that, but apparently that information had not, we didn't have information like that at the district court level. Okay. Go into the issue of sufficient evidence. And again, these are a number of issues that may not on their own have tipped the scale, but together they show that there was some fishiness going on. There was a question with regard to the questionnaire. The questionnaire has a box about whether you would recommend the person for this position, and if not, why. And the secretary of the commission testified that if there's no indication in there, if there's no helpful information about why, then we don't usually look at that as a red flag. We don't present it to the commission. But even with that, even with that box checked and no specific information provided under that box, it was still presented to the commission. Your time has expired. Okay. Thank you. I have some time for rebuttal. Actually, your time has expired, but I'll give you a little bit of time in rebuttal. Okay. Thank you. Mr. Fowler. Thank you. May it please the court. This is a case alleging race discrimination from an applicant who was unsuccessful when his then-current employer gave what is admittedly and objectively a bad reference. There's no dispute about that. The arguments that the appellant has made simply don't support his position. Number one, he referenced and I'll take it in this order. He says that the commission's explanation shouldn't be credited because according to the testimony of Ms. Taylor, she says that if it's only a recommendation against hire without any explanation, she wouldn't give that to the commission. But she very clearly testified that she viewed this recommendation when viewed in this context as a red flag, and that when she perceives something as a red flag, she takes it to the commission. This wasn't simply a matter of a box being checked without an explanation. The reference itself contains sufficient information. Mr. Goldman mentioned that Mr. Norberg, who is the commissioner, made what he calls a racist comment. Judge Hamilton is exactly correct. The comment was that Mr. Norberg referred to one of his equals, somebody else on the commission, using the term colored. Admittedly, that's not a politically correct term. It is not a racist term. And more to the point, it doesn't show any animosity based on race. It doesn't have anything to do with the plaintiff or with the circumstances of the plaintiff not being considered for the job anymore. And under the cases that this court has referred to repeatedly, it's a stray comment. Counsel refers to a statistics argument. But the statistics argument, as the district court recognized, statistics is only helpful when there is other evidence of discrimination. It can't create evidence of discrimination in and of itself because statistics don't show the cause. They don't show the causal factor. And here, it was up to the plaintiff to come up with some evidence of his race being a causal factor. He didn't. Mr. Feller, I guess I'm still kind of troubled by it when I look at these numbers. Two out of six minority candidates are certified, one-third, and more than three-quarters of white candidates are certified. So, first, the numbers are based upon self-reporting. The numbers don't include everybody who applied. That is a limitation in and of itself. There, as I recall, when you look at the charts of the applicant flow, there were about 288 people who applied. There were eight people who were offered jobs. When you look at those numbers, and specifically the number of people who were ultimately successful, that doesn't show it's not a big enough sample size without going into the reasons for statistics to be helpful. I agree with Your Honor that at first blush, I understand why counsel makes the argument, but the reality is when considered in the totality here, it's just not enough to carry the day. Finally, counsel argues about the reasonableness of Sergeant Ackerberg's background investigation, but what he doesn't note is that in the 56.1 response, he specifically admitted the following, that Ackerson conducted all background investigations for hire consistent with the guidelines of such policies  He didn't violate any standards. He didn't not do something that he should have done. He did exactly what he was supposed to do, and that doesn't allow a basis for claiming that race played a factor. Finally, counsel argues about the failure to disclose the reason, but again, we've made it clear in the briefs. This is something that county ordinance did not allow anybody to tell Mr. Burton why he wasn't selected, why he was removed from the process. As soon as we filed our answer to the complaint, we voluntarily and immediately notified plaintiff's counsel what had happened, what was going on. That was the first opportunity to do so. The fact that it hadn't been done beforehand, because of the county ordinance, is not an indicia of race discrimination. With that, I think that our briefs are pretty thorough, and unless the panel has other questions, I'd be happy to stand on the briefs. Thank you. With that, we then ask that the court affirm the decision of the district court granting summary judgment to the employer. Thank you. Mr. Goldman, I'll give you a minute in rebuttal. I just wanted to point out one thing. With regard to the commissioner's comment, this is the only indication of what kind of things went on at the commission decision-making level. Here's a gentleman who referred to one of his other commissioners in this way, using very outdated and, to date, racist, in my opinion, language. This was in a deposition about a race discrimination case. One can only imagine how this gentleman really felt about African Americans and how he speaks about them in an informal way. With that, we request that the decision of the district court be reversed and that this case be remanded for trial. Thank you very much. Our thanks to both counsel. The case is taken under advisement. That concludes the court's calendar for today. The court is in recess.